UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAFAEL GUZMAN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>A. FRAZIER, et.al.,<br><br>　　　　Defendants. | Case No.: 1:12-cv-00828-LJO-SAB (PC)<br><br>FINDINGS AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>[ECF No. 46] |

Plaintiff Rafael Guzman is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

**I.**

**PROCEDURAL HISTORY**

This action is proceeding on Plaintiff's second amended complaint against Defendants Frazier and Snyder based on Plaintiff's claim for failure to protect in violation of the Eighth Amendment.

On July 20, 2015, Defendants filed a motion for summary judgment. (ECF No. 46.) Pursuant to court order, Plaintiff filed an opposition on October 16, 2015. (ECF No. 50.) Defendants filed a reply on October 23, 2015.[1] (ECF No. 51.)

---

[1] Defendants initially oppose Plaintiff's opposition on the ground that it is untimely. Defendants correctly point out that Plaintiff filed his opposition on October 10, 2015, in response to the court's order of September 18, 2015. Defendants do

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011). Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

---

not provide a valid basis to not consider Plaintiff's opposition, particularly given that it was timely filed in response to the court's order and there is a lack of prejudice to Defendants.

2

In arriving at this recommendation, the Court has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### III.
### DISCUSSION

#### A. Summary of Plaintiff's Complaint

On January 29, 2011, at approximately 8:20 a.m., Defendant Frazier approached Plaintiff in his cell and informed him he was allowed to go to yard. Plaintiff was taken out of his cell, and Defendant Snyder searched him in the holding cages. Plaintiff was then led down a hallway out of the cell block by both Frazier and Snyder. Plaintiff proceeded to make a right turn which would have placed him in the proper exercise yard. However, at that point, in the very presence of, and heard by Frazier, Snyder ordered Plaintiff to make a left turn to the group yards.

In the presence of and heard by Frazier, Plaintiff informed and said out loud to Snyder that he is member if the Southern Group and his life would be in danger if he was placed in the Northern Group yard. In the presence of and heard by Frazier, Snyder told Plaintiff that she is going to see what Plaintiff is made of. Plaintiff turned his attention to Frazier and asked her, "what is going on here?" Frazier just laughed at Plaintiff.

Defendants Snyder and Frazier willfully and unlawfully escorted Plaintiff to the Northern Group yard. Snyder on one side holding Plaintiff's arm, and Frazier on the other side holding Plaintiff's other arm. Defendants willfully and unlawfully placed Plaintiff in the Northern Group yard.

Plaintiff asserts that Snyder and Frazier knowingly, intentionally, and willfully placed Plaintiff in the Northern Group yard against his will, resulting in Plaintiff being the victim of an assault causing him severe injuries. Plaintiff was also shot in the back by a prison guard with a big block gun.

Prior to Plaintiff being placed into the inmate population, the placement committee interviews an inmate California Department of Corrections and Rehabilitation (CDCR) 1286 report which takes

1 into consideration certain relevant information to prevent certain civil rights violations as occurred
2 herein.

3     On January 28, 2011, at about 6:40 a.m., Plaintiff was using the toilet in his cell, and Snyder
4 kicked his door and said "you're assed out on your lunches because you have that shit on your
5 window!" Plaintiff immediately told Snyder that he did not wish to disrespect her or any other female
6 staff while Plaintiff was defecating. Snyder responded loudly to Plaintiff as she was walking out of
7 the cell block stating, "If you don't play by my rules you don't have shit coming!" Minutes later when
8 officer Kephart walked into the cell block, Plaintiff's cellmate Rivera asked officer Kephart about
9 their lunches and also told her what had just occurred with Snyder. Officer Kephart told inmate
10 Rivera that Snyder was just trying to mark her territory and that Snyder overreacts sometimes but she
11 would talk to her to give them their lunches. However, moments later Snyder opened their tray slot,
12 threw two lunches inside the cell, and loudly told Plaintiff, "you want to rat me out, you will see what
13 I am made of!" then walked away.

### B. Statement of Undisputed Facts

1. At all times relevant to this action, Plaintiff Rafael Guzman (F-80505) was a state prisoner in the custody of the California Department of Corrections and Rehabilitation (CDCR) and housed on Facility B, Housing Unit 6 at California Correctional Institute (CCI).

2. At all times relevant to this action, Defendants Frazier and Snyder were correctional officers over Facility B, Unit 6 at CCI. (ECF No. 46-3, Declaration of R. Snyder, ¶ 1 (hereinafter Snyder Decl); Declaration of A. Frazier, ¶ 1 (hereinafter Frazier Decl.).)

3. At all times relevant to this action, P. Hanson was a correctional officer in the B Facility, Unit 6 at CCI. (ECF No. 46-3, Declaration of P. Hanson, ¶ 1 (hereinafter Hanson Decl.).)

**THE OFFICERS**

4. On January 29, 2011, all four correctional officers, Davis, Kephart, Snyder and Frazier, were newly assigned to Facility B as they had each only been on the Facility for a couple days. (Snyder Decl. ¶ 4; Frazier Decl. ¶ 4; Guzman Deposition Transcript (hereinafter Guzman Dep.) 28:6-29:11, 30:19-22, April 28, 2015.) The officers, including Defendants, were not yet

familiar with the inmates in Facility B.  (Snyder Decl. ¶ 4; Frazier Decl. ¶ 4.)  The observation officer, officer Hanson, was also newly assigned to Facility B and unfamiliar with the inmates or correctional staff.  (P. Hanson Decl. ¶ 4.)

**THE UNIT**

5.     CCI, Facility B is a Security Housing Unit (SHU) which can house approximately 750 inmates who have been designated as MAX-Custody and have received an Indeterminate or Determinate SHU term.   (Frazier Decl. ¶ 2; Snyder Decl. ¶ 2.)  All inmate movement within the SHU is controlled/escorted by correctional officers, and all inmates being escorted or removed from their cells are in handcuffs.  (Id.)  All inmates, prior to being escorted, are required to submit to body inspections/searches and are wanded with a hand-held metal detector or processed through a walk-through metal detector.  (Id.)  Within Facility B, there are eight SHU Buildings with a total of 516 cells, which are split between the Facility B yard, identified as A-side and B-side.  (Id.)  During this time period, the B side yard was equipped with Individual Exercise Modules for inmates who were not cleared by the Institutional Classification Committee (ICC) for group yard based on safety and security concerns for use by all eight Housing Units.  (Id.)  Inmates cleared by ICC for Controlled Compatible Group Yards used the exercise yards attached to the housing units for group exercise.  (Id.)

**PREPARATION FOR RELEASE TO YARD**

6.     Shortly after 8:00 a.m., in response to orders from their sergeant, the officers finished providing inmate showers and organized them for yard time on their appropriate yards. (Frazier Decl. ¶¶ 6-7; Snyder Decl. ¶¶ 6-7.)

7.     Correctional officers Snyder, Davis and Frazier finished providing inmate showers and returned inmates to their cells while correctional officer Kephart wrote down the yard list based off a previously hand written yard list.  (Frazier Decl. ¶ 7; Snyder Decl. ¶ 7.)  The four correctional officers then divided the distribution of work.  (Frazier Decl. ¶ 8; Snyder Decl. ¶ 8.)  Defendant Frazier, along with officer Davis, escorted the Northern Hispanic inmates onto their yard while officers Snyder and Kephart let out the Southern Hispanic inmates onto their yard.  (Id.)

8.  Northern Hispanic and Southern Hispanic inmates have to be separated as the two are rival gangs. (Hanson Decl. ¶ 9.) They cannot be placed on the same yard or celled with one another, or violence is likely to erupt. (Frazier Decl. ¶ 9; Snyder Decl. ¶ 9; Hanson Decl. ¶ 9.) If a Northern Hispanic inmate is accidentally released on a Southern Hispanic yard, or vice versa, gang rules require that the rivals fight. (Frazier Decl. ¶ 10; Snyder Decl. ¶ 10; Hanson Decl. ¶ 10.) If a Northern Hispanic or a Southern Hispanic does not fight a rival gang member, he will be pushed out of the gang and the other gang members will want him killed. (Frazier Decl. ¶ 11; Snyder Decl. ¶ 11; Hanson Decl. ¶ 11.) Sometimes, gang members who have been ostracized can earn their way back. (Id.) Inmate Guzman, CDCR number F-80505, is a documented member of the Southern Hispanic gang. (Frazier Decl. ¶ 12; Snyder Decl. ¶ 12; Hanson Decl. ¶ 12.) But, officer Hanson was unaware of Plaintiff's gang affiliation at the time.[2] (Hanson Decl. ¶ 12.)

9.  While using a handwritten copy of the yard list, correctional officer Kephart inadvertently transposed cell B107 with B102 while writing the new yard list. (Frazier Decl. ¶ 13; Snyder Decl. ¶ 13.) A different inmate by the name of Guzman was located in cell B107. This second inmate Guzman, was a member of the rival Northern Hispanic gang. (Frazier Decl. ¶ 14; Snyder Decl. ¶ 14.) Due to the error in transcribing the cell numbers, and the officers' unfamiliarity with the inmates in the housing unit, all four officers were unaware there was an inmate also named Guzman, who was a Northern Hispanic gang member, in cell B107. (Id.) Because the transposed list prepared by correctional officer Kephart stated that the Guzman located in cell B102 was to be released on the Northern yard, and there was not a Guzman in cell B102, the officers though the list was actually supposed to read cell B101. (Frazier Decl. ¶ 15; Snyder Decl. ¶ 15.) Inmate Guzman, CDCR number F-80505, a Southern Hispanic gang member-the Plaintiff in this case, was located in cell B101. (Frazier Decl. ¶ 16; Snyder Decl. ¶ 16.)

---

[2] Defendants attribute this latter sentence as being attributed to themselves (Frazier and Snyder); however, neither Frazier's or Snyder's declarations state that they were unaware of Plaintiff's gang affiliation at the time. (See ECF No. 46-3, Exs. B&C.)

10. At the time, Plaintiff inmate Guzman's yard time was restricted to an individual exercise module and he was not permitted to have regular yard time. (Frazier Decl. ¶ 18; Snyder Decl. ¶ 18; Guzman Dep. at 47:12-19.)

11. Individual exercise modules are 12-feet wide by 14-feet in depth and 10-feet in height, constructed of expanded metal. (Frazier Decl. ¶ 19; Snyder Decl. ¶ 19.) They have a partial 6-inch-by-7-inch corrugated area with a sink and toilet. (Id.) Individual exercise modules are used by inmates who are assigned to them by the ICC. (Id.) Inmates assigned to individual exercise modules are placed in them alone or with their cellmates. (Id.)

12. As officer Davis was the only male correctional officer on the facility at the time, he performed the strip search of inmate Guzman. (Frazier Decl. ¶ 22; Snyder Decl. ¶ 22.) Officers Snyder, Kephart and Frazier are all female. (Id.) Plaintiff did not say anything to officer Davis while he was strip searched. (Frazier Decl. ¶ 23; Snyder Decl. ¶ 23.)

13. The officers remained on each side of inmate Guzman, per policy, as they escorted him to the Grill Gate. (Guzman Dep. at 46:11-18.) Before entering the Grill Gate area, Defendant Snyder used a hand-held metal detector on inmate Guzman and patted him down to check for metal items on his person that could be used as a weapon before allowing him to pass to the Grill Gate where officer Kephart stood. (Frazier Decl. ¶ 26; Snyder Decl. ¶ 26; Hanson Decl. ¶ 13; Guzman Dep. at 42:9-12.) Plaintiff remained silent while Defendant Snyder wanded him and patted him down. (Frazier Decl. ¶ 27; Snyder Decl. ¶ 27; Guzman Dep. at 44:4-19.)

14. The Grill Gate is a metal gated enclosure, measured approximately six-feet by six-feet, located between the rotunda and the yard where inmates are placed alone to ensure officer safety during the transition from the rotunda to the yard. (Frazier Decl. ¶ 28; Snyder Decl. ¶ 28; Hanson Decl. ¶ 14.) This safety measure ensures inmates cannot rush and overpower officers when they are let back into the housing unit. (Id.) It also allows officers control by only allowing one inmate in the Grill Gate at a time. (Id.) Officers do not enter the Grill Gate area unless there is an emergency. (Id.)

15. Once Plaintiff walked into the Grill Gate, officer Kephart closed the door and removed Plaintiff's handcuffs. (Frazier Decl. ¶ 29; Snyder Decl. ¶ 29; Hanson Decl. ¶ 13; Guzman

1  Decl. at 54:1-7.)  Defendant Frazier stood nearby while officer Kephart removed the handcuffs
2  from inmate Guzman.  (Frazier Decl. ¶ 30.)  Inmate Guzman remained silent while the
3  handcuffs were removed.  (Guzman Dep. at 54:4-7.)  Inmate Guzman was alone in the Grill
4  Gate area.  (Frazier Decl. ¶ 31; Snyder Decl. ¶ 31; Hanson Decl. ¶ 13.)

5  16.   Officer Hanson, the observation officer, then requested Plaintiff's name.  (Hanson
6  Decl. ¶ 15.)  Normally, the officer requests the inmate's name and CDCR number, but if
7  Plaintiff provided his CDCR number, it was inaudible.  (Id.)  However, if Plaintiff had
8  provided his CDCR number, the error may have been caught and he would not have been
9  released onto the incorrect yard.  (Frazier Decl. ¶ 33.)

**FIGHT ON THE YARD**

17.   The control booth operator then opened the door to allow Plaintiff to enter the yard.
(Frazier Decl. ¶ 34; Hanson Decl. ¶ 17; Guzman Dep. at 54:14-55:1.)  No one, including either
Defendant, pushed Plaintiff onto the yard.  (Frazier Decl. ¶ 35.)

18.   When the door was opened, inmate Guzman did not yell out to any of the correctional
officers that he needed help or was being placed on the incorrect yard, even though he had the
time and ability to.  (Guzman Dep. at 64:1-25.)  Inmate Guzman then walked approximately
five feet onto the yard directly up to one of the inmates, a member of the Northern Hispanic
gang, and shook his hand.  (Hanson Decl. ¶ 19; Guzman Dep. at 55:19-23.)  The two spoke to
one another in a calm manner for a brief period.  Then, without warning, the two men began to
fight.  (Hanson Decl. ¶ 19; Guzman Dep. at 55:9-12.)

19.   Officer Hanson had the MINI 14 slung over his shoulder, but transitioned to the less-
lethal 40mm and lifted it up to aim.  (Hanson Decl. ¶ 20.)  The gun was loaded with large
40mm foam, non-lethal bullets.  (Id.)  Officer Hanson attempted to aim at the inmates' lower
bodies to get them to cease fighting, but was unable to do so due to their rapid movement.  (Id.
at ¶ 21.)  He then shot one round at inmate Guzman who responded to his command and
assumed a prone position after the shot was fired.  (Hanson Decl. ¶ 21; Guzman Dep. at 61:17-
62:13.)  He then shot one round at the inmate Guzman was fighting, who was still standing.
(Hanson Decl. ¶ 21.)  The inmate assumed a prone position shortly thereafter.  (Id.)

20. Officer Hanson was able to stop the fight between the inmates with the minimal amount of force necessary. (Hanson Decl. ¶ 22.) The fight lasted approximately fifteen second after it started, when it was broken up by officer Hanson. (Id.)

**AFTER THE INCIDENT**

21. After the incident, Plaintiff bragged to Defendant Snyder saying he was going to sue her. (Frazier Decl. ¶ 39; Snyder Decl. ¶ 39.) Anytime she did something he did not like, he said he was going to sue her. (Id.) He did not make the same threats to the other officers, despite the fact that Defendant Snyder's involvement in placing Plaintiff on the incorrect yard was limited. (Id.)

### C. Failure to Protect

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006). Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994) (quotations omitted). Prison officials have a duty under the Eighth Amendment to protect prisoners from violence at the hands of other prisoners because being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society. Farmer, 511 U.S. at 833-34 (quotation marks omitted); Clem v. Lomeli, 566 F.3d 1177, 1181 (9th Cir. 2009); Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005). However, prison officials are liable under the Eighth Amendment only if they demonstrate deliberate indifference to conditions posing a substantial risk of serious harm to an inmate; and it is well settled that deliberate indifference occurs when an official acted or failed to act despite his knowledge of a substantial risk of serious harm. Farmer, 511 U.S. at 834, 841 (quotations omitted); Clem, 566 F.3d at 1181; Hearns, 413 F.3d at 1040.

Where failure to protect is alleged, the defendant must knowingly fail to protect plaintiff from a serious risk of conditions of confinement where defendant had reasonable opportunity to intervene. Orwat v. Maloney, 360 F.Supp.2d 146, 155 (D. Mass. 2005), citing Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n. 3 (1st Cir. 1991); see also Borello v. Allison, 446 F.3d 742, 749 (7th Cir. 2006) (defendant's deliberate indifference must effectively condone the attack by allowing it to

1 happen); accord, Farmer, 511 U.S. at 833-834 (if deliberate indifference by prison officials effectively condones the attack by allowing it to happen, those officials can be held liable to the injured victim). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstrating in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842.

**D.    Defendants' Version of the Facts**

Defendants object to Plaintiff's opposition because Plaintiff failed to reproduce the itemized facts or identify which, if any, of the undisputed facts he claims are disputed.  Defendants argue that Plaintiff's opposition fails to cite to any evidence other than his own opinion.  Defendants also submit that Plaintiff's October 10, 2015, opposition was not timely as it filed over two months past the due date.

Defendants Snyder and Frazier argue they acted reasonably under the objective prong of the deliberate indifference standard and cannot be liable.  Defendants' submit that their actions amount to negligence, at best.

Defendants submit that on January 29, 2011, the four correctional officers working, David, Kephart, Snyder and Frazier, were newly assigned to Facility B and had each only been on the Facility for a couple days.  The officers, including Defendants, were not yet familiar with the over 100 inmates in Facility B.  After completion of inmate showers, officer Kephart wrote down the yard list based off a previously hand-written yard list.

Officers Snyder, Davis and Frazier finished inmate showers and returned the inmates to their cells, while officer Kephart wrote down the yard list based off a previously hand-written yard list.  The four officers then divided the distribution of work.  Defendant Frazier, along with officer Davis, escorted the Northern Hispanic inmates onto their yard, while Defendant Snyder and officer Kephart let out the Southern Hispanic inmates onto their yard.

While using a previously handwritten copy of the yard list, officer Kephart inadvertently transposed cell B107 with B102 while writing the new yard list.  A different inmate by the name of Guzman was located in cell B107.  The second inmate Guzman was a member of the rival Northern

1  Hispanic gang.  Due to the error in transcribing and interpreting the cell numbers, and the officers'
2  unfamiliarity with the inmates in the housing unit, all four officers were unaware there was an inmate
3  also named Guzman, who was a Northern Hispanic gang member in cell B107.  Because the
4  transposed list prepared in error by officer Kephart stated that the Guzman located in cell B102 was to
5  be released on the Northern yard, and there was not a Guzman in cell B102, the officers thought the
6  list was actually supposed to read cell B101.  Therefore, he was released from his cell to yard on
7  January 29, 2011.  At the time, Plaintiff inmate Guzman's yard time was restricted to an individual
8  exercise module and he was not permitted to have regular yard time.
9          Defendant Frazier escorted the Northern Hispanic onto the Northern yard with officer Davis.
10 Officer Kephart and Defendant Snyder finished the escort of the Southern Hispanic inmates to their
11 yard before officer Davis and Defendant Frazier finished escorting the Northern Hispanic inmates to
12 their yard.  Officer Davis and Defendant Frazier then escorted Plaintiff to the cell module located
13 inside the housing unit for a strip search, which is customarily performed before inmates are allowed
14 onto the yard.  As officer Davis was the only male correctional officer on the facility at the time, he
15 performed the strip search of inmate Guzman.  Officer Kephart and Defendants Snyder and Frazier are
16 all female.  Plaintiff did not say anything to officer Davis while he was strip searched.
17         Officer Davis and Defendant Frazier then allowed inmate Guzman to put his clothes back on
18 and lead him down to the rotunda.  Plaintiff remained silent during the escort, despite knowing he was
19 not supposed to go to yard and instead was supposed to go to the individual exercise module for
20 exercise.  Before entering the Grill Gate area, Defendant Snyder used a hand-held metal detector and
21 patted Plaintiff down to check for metal items on his person that could be used as a weapon before
22 allowing him to pass to the Grill Gate where officer Kephart stood.  Plaintiff remained silent while
23 Defendant Snyder wanded him and patted him down.
24         Once Plaintiff walked into the Grill Gate, officer Kephart closed the door and removed
25 Plaintiff's handcuffs.  Defendant Frazier stood nearby while officer Kephart removed the handcuffs
26 from inmate Guzman.  Defendant Snyder was not near Plaintiff at this time and did not place him in
27 the Grill Gate area.  Plaintiff was alone inside the Grill Gate area.  Correctional staff are not to enter
28

the Grill Gate area with inmates as it creates a safety hazard. The Grill Gate area is meant as a barrier between the yard and the rotunda to prevent inmates in the yard from charging officers in the rotunda.

Officer Hanson, the observation officer, then requested Plaintiff's name. Plaintiff either mumbled his CDCR number or failed to provide it. However, if Plaintiff had audibly provided his CDCR number, or informed staff they were placing him on the incorrect yard, the error could have been remedied. Plaintiff, instead, remained silent as to the issue.

The control booth operator then opened the door to allow Plaintiff to enter the yard. No once, including Defendants, pushed Plaintiff onto the yard. He walked out on his own volition. He then walked up to one of the Northern Hispanic gang members, and shook his hand. The two engaged in a brief conversation, and then, without warning, began to fight. The fight lasted approximately fifteen seconds, when it was broken up by officer Hanson.

None of the officers, including Defendants, intentionally placed, or took part in placing, Plaintiff on the Northern Hispanic yard. Due to the error in transcribing the yard list, all officers, including Defendants, thought they were placing the Northern Hispanic gang member Guzman onto the yard.

After the incident, Plaintiff bragged to Defendant Snyder saying he was going to sue her. Anytime she did something he did not like, he said he was going to sue her. He did not make the same threats to the other officers, despite the fact that Defendant Snyder's involvement in placing Plaintiff on the incorrect yard was limited.

E.   **Plaintiff's Version of the Facts**

As previously stated, although Plaintiff filed an opposition, it is not signed under penalty of perjury and cannot itself be considered as an opposing affidavit and suffices to present argument only, not evidence. Thus, in order to state a plausible claim for relief against Defendants Snyder and Frazier, Plaintiff's complaint and deposition testimony must include enough "factual content that allows the court to draw the reasonable inference," Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. 556), that both Snyder and Frazier knew Plaintiff was a Southern Hispanic gang member and could not be placed on the Northern Hispanic gang exercise yard, and failed to take reasonable action to abate it. See Wallis v. Baldwin, 70 F.3d 1074 1077 (9th Cir. 1995).

Plaintiff's point of view differs with respect to the interaction on January 29, 2011, and Plaintiff's version of events is corroborated by the testimony he provided at his deposition taken on April 28, 2015. (ECF No. 47, Guzman Dep. at 23-28, 40-54.)

Plaintiff contends that on January 29, 2011, at approximately 8:20 a.m., Defendant Frazier approached Plaintiff in his cell and informed him he was allowed to go to yard. Plaintiff was taken out of his cell, and Defendant Snyder searched him in the holding cages. Plaintiff was then led down a hallway out of the cell block by both Frazier and Snyder. Plaintiff proceeded to make a right turn which would have placed him in the proper exercise yard. However, at that point, in the very presence of, and heard by Frazier, Snyder ordered Plaintiff to make a left turn to the group yards.

In the presence of and heard by Frazier, Plaintiff informed and said out loud to Snyder that he is member if the Southern Group and his life would be in danger if he was placed in the Northern Group yard. In the presence of and heard by Frazier, Snyder told Plaintiff that she is going to see what Plaintiff is made of. Plaintiff turned his attention to Frazier and asked her, "what is going on here?" Frazier just laughed at Plaintiff.

Defendants Snyder and Frazier willfully and unlawfully escorted Plaintiff to the Northern Group yard. Snyder on one side holding Plaintiff's arm, and Frazier on the other side holding Plaintiff's other arm. Defendants willfully and unlawfully placed Plaintiff in the Northern Group yard.

Plaintiff asserts that Snyder and Frazier knowingly, intentionally, and willfully placed Plaintiff in the Northern Group yard against his will, resulting in Plaintiff being the victim of an assault causing him severe injuries. Plaintiff was also shot in the back by a prison guard with a big block gun.

On January 28, 2011, at about 6:40 a.m., Plaintiff was using the toilet in his cell, and Snyder kicked his door and said "you're assed out on your lunches because you have that shit on your window!" Plaintiff immediately told Snyder that he did not wish to disrespect her or any other female staff while Plaintiff was defecating. Snyder responded loudly to Plaintiff as she was walking out of the cell block stating, "If you don't play by my rules you don't have shit coming!" Minutes later when officer Kephart walked into the cell block, Plaintiff's cellmate Rivera asked officer Kephart about their lunches and also told her what had just occurred with Snyder. Officer Kephart told inmate Rivera that Snyder was just trying to mark her territory and that Snyder overreacts sometimes but she

1  would talk to her to give them their lunches.  However, moments later Snyder opened their tray slot,
2  threw two lunches inside the cell, and loudly told Plaintiff, "you want to rat me out, you will see what
3  I am made of!" then walked away.  Plaintiff's version of events that took place on January 28, 2011, is
4  corroborated by his deposition testimony.  (ECF No. 47, Guzman Dep. at 33-39.)

5        **F.**      **Analysis and Findings on Defendants' Motion**

6        **1.**      **Failure to Protect**

7        Defendants initially argue that they acted reasonably under the objective prong of the
8  deliberate indifference standard and cannot be held liable.  Defendants reason that their actions
9  amount to negligence, at best.  Defendants argue that their actions were not "repugnant to the
10  conscience of mankind."  Estelle, 429 U.S. at 105-106.  Defendants submit that the mistake in
11  transcribing the yard list and corresponding cell numbers and yard placement was understandable
12  given their relative newness to the housing unit.  Defendants further argue that Plaintiff cannot meet
13  the subjective prong of the deliberate indifference standard.

14        Defendants argue that even if they knew Plaintiff was a Southern Hispanic gang member,
15  their actions were in no way indicative of them having any knowledge that Plaintiff would engage in a
16  fight once placed on the yard.  However, contrary to Defendants' argument, Defendants Frazier and
17  Snyder declare (and it is undisputed) that Northern Hispanic and Southern Hispanic inmates have to be
18  separated as the two are rival gangs.  They cannot be placed on the same yard or celled with one
19  another, or violence is likely to occur.  (Frazier Decl. ¶ 9; Snyder Decl. ¶ 9.)  If a Northern Hispanic is
20  accidentally released on a Southern Hispanic yard, or vice versa, gang rules require that the rivals
21  fight.  (Id. ¶ 10.)  If a Northern Hispanic or a Southern Hispanic does not fight a rival gang member,
22  he will be pushed out of the gang and other gang members will want him killed.  (Id. ¶ 11.)  Indeed,
23  the danger was evident in this case based on the fact that Plaintiff was involved in a fight with a rival
24  Northern Hispanic gang member.  Defendants cannot creditably argue that placement of Plaintiff in a
25  yard with a rival gang member does not constitute an objectively serious harm.

26        In addition, viewing in the light most favorable to Plaintiff, there is sufficient evidence that
27  Defendants Snyder and Frazier were subjectively aware of Plaintiff's Southern Hispanic gang status
28  and knowingly allowed and/or released him to the Northern Hispanic exercise yard.  Although Snyder

1  and Frazier both insist that they had no prior knowledge of Plaintiff's gang affiliation and Plaintiff did
2  not inform either of them on the day of January 29, 2011, there is conflicting evidence presented.
3  First, although Defendants Snyder and Frazier deny knowledge of Plaintiff's Southern Hispanic gang
4  affiliation, neither of their declarations specifically declares such fact (and is at least subject to
5  debate).  (See ECF No. 46-3, contrast Hanson Decl. ¶ 12 (Ex. D.), with Snyder Decl. ¶ 12 (Ex. B.) &
6  Frazier Decl. ¶ 12 (Ex. C).)  Second, Plaintiff declares that he specifically informed Defendant Snyder
7  in the presence of Defendant Frazier that he is member if the Southern Group and his life would be in
8  danger if he was placed in the Northern Group yard.  In the presence of and heard by Frazier, Snyder
9  told Plaintiff that she is going to see what Plaintiff is made of.  Plaintiff turned his attention to Frazier
10 and asked her, "what is going on here?"  Frazier just laughed at Plaintiff.  Third, Plaintiff submits
11 evidence, which if believed by the jury, could establish a motive on the part of Defendants.  Plaintiff
12 alleges, by way of verified complaint, that just one day prior to the incident on January 28, 2011, at
13 about 6:40 a.m., Plaintiff was using the toilet.  Defendant Snyder kicked the door and said, "You're
14 assed out on your lunches because you have that shit on your window!"  Plaintiff's cell door was
15 partially covered.  Plaintiff immediately told her that he did not wish to disrespect her or any other
16 female staff while Plaintiff was defecating.  Snyder responded loudly at Plaintiff as she was walking
17 out of the cell-block, "If you don't play by my rules you don't have shit coming!"  Minutes later when
18 officer Kephart walked into the cell-block, Plaintiff's cellmate Rivera asked Kephart about their
19 lunches, and also told her what had just taken place with officer Snyder.  Kephart then told inmate
20 Rivera that officer Snyder was just trying to mark her territory and Snyder over-reacts sometimes but
21 she would talk to Snyder to provide their lunches.  Moments later, Defendant Snyder opens the tray
22 slot, throws two lunches inside the cell, and loudly said to Plaintiff, "You want to rat me out, you will
23 see what I am made of!" then walked away.  (ECF No. 17, 2nd Amd. Compl. at 7-8.)  Defendants
24 deny all of Plaintiff's allegations.
25        Defendants argue repeatedly that Plaintiff failed to inform any officer, including themselves
26 that he was a Southern Hispanic gang member and could not be released to the Northern Hispanic
27 exercise yard.  Defendants argue and Plaintiff admits that he remained silent while the handcuffs were
28 removed and did not yell for help prior to entering the Northern Hispanic exercise yard.  However,

Plaintiff explained at his deposition that he was threatened and warned that his failure to comply with officers' orders would result in a rules violation report. (See Guzman Dep. at 51-53, 63-64, 67-68.) Plaintiff also testified that he refused to allow the handcuffs to be taken off while inside the grill gate out of fear for his safety, but he was threatened with a rules violation. (See Guzman Dep. at 53.) In addition, Plaintiff testified that he had gang tattoos consisting of the number 13 on his knuckles (which is a well-known symbol of the Southern Hispanic gang) and gang member name of Babrrio Pobre on his forehead and neck-which may give rise to a reasonable inference of knowledge. (Id. at 57-60.) The extent of Defendants' knowledge of Plaintiff's gang affiliation and the exact events leading up to his release to the Northern Hispanic exercise yard are disputed and are issues to be resolved by the trier of fact, not the Court.

Based on the conflicting testimony presented by way of verified affidavits and deposition testimony, there is a genuine issue of material fact as to whether Defendants Snyder and Frazier failed to protect Plaintiff from harm on January 29, 2011, by allowing his release to the Northern Hispanic exercise yard. The Court cannot weigh the parties' conflicting evidence or make credibility determinations on summary judgment, see, e.g., George v. Edhom, 752 F.3d 1206, 1214 (9th Cir. 2013) and Plaintiff's evidence suffices to create a disputed issue of material fact as to whether Defendants Snyder and Frazier knowingly disregarded a substantial risk of serious harm. Summary judgment in their favor should be denied.

### 2. Qualified Immunity

Finally, Defendants argue that they are entitled to qualified immunity. Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted). Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan,

555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

In resolving the claim of qualified immunity, the Court must determine whether, taken in the light most favorable to Plaintiff, Defendants' conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001); Mueller, 576 F.3d at 993. While often beneficial to address in that order, the Court has discretion to address the two-step inquiry in the order it deems most suitable under the circumstances. Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993-94.

  a. Constitutional Violation

"The constitutional right at issue in this case is the right to be free from violence at the hands of other inmates," Castro v. Cnty. Of Los Angeles, 785 F.3d 336, 344 (9th Cir. 2015), and the fact must be viewed in the light most favorable to Plaintiff, Chappell v. Mandeville, 706 F.3d 1052, 1057 (9th Cir. 2013). This case involves violence between rival gang members during outside yard exercise.

Plaintiff is a Southern Hispanic gang inmate and, in January 2011, was restricted to individual exercise module in January 2011 and he was not actually permitted to have regular yard time. On January 29, 2011, Plaintiff was released on the Northern Hispanic exercise yard and was involved in the physical altercation with a rival gang member. Plaintiff contends, by way of verified complaint, that on January 29, 2011, he informed Defendant Snyder, in front and heard by Defendant Frazier, that he was a Southern Hispanic gang member and his personal safety would be in jeopardy if released to the Northern Hispanic exercise yard, yet Defendant Snyder told him that she is going to see what Plaintiff is made of.

Plaintiff's evidence regarding the events in question, accepted as true at this juncture, is sufficient to allow a reasonable jury to conclude that Defendants knowingly disregarded an objectively serious risk of harm to Plaintiff's safety, in violation of the Eighth Amendment. Foster v. Runnels, 554 F.3d 807, 815 (9th Cir. 2009).

///

      b.      <u>Clearly Established Right</u>

Regarding the second step of the inquiry, "[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he/she is doing violates that right." <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002). While the reasonableness inquiry may not be undertaken as a broad, general proposition, neither is official action entitled to protection "unless the very action in question has previously been held unlawful." <u>Hope</u>, 536 U.S. at 739. "Specificity only requires that the unlawfulness be apparent under preexisting law," <u>Clement v. Gomez</u>, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted), and prison personnel "can still be on notice that their conduct violates established law even in novel factual circumstances," <u>Hope</u>, 536 U.S. at 741.

The existence of material factual disputes does not necessarily preclude a finding of qualified immunity. <u>Estate of Ford</u>, 301 F.3d at 1053. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731 (2011). Here, however, the duty to protect inmates form harm at the hands of other inmates had long been established by 2011, and no reasonable officer could have believed that releasing a Southern Hispanic gang member inmate on to the Northern Hispanic gang yard was appropriate when they were notified by Plaintiff of his gang affiliation. The Court reiterates that to the extent Plaintiff's version of events lack credibility and/or is undermined by some of the facts presented, that evaluation must be made by the jury. <u>See, e.g.</u>, <u>Cortez v. Skol</u>, 776 F.3d 1046, 1053 (9th Cir. 2015); <u>Bravo v. City of Santa Maria</u>, 665 F.3d 1076, 1083 (9th Cir. 2011).

Accordingly, the Court finds that Defendants are not entitled to qualified immunity.

## IV.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that Defendants' motion for summary judgment, filed on July 20, 2015, be DENIED, and this action be set for trial.

This Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with this Findings and Recommendation, the parties may file written objections with the

Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 16, 2015**

UNITED STATES MAGISTRATE JUDGE